# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                                                No. 1:19-CR-2618 WJ

VINCENT LUNA,

    Defendant.

## MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AND STATEMENTS

THIS MATTER IS BEFORE THE COURT on Defendant Vincent Luna's Motion to Suppress Evidence and Statements ("Motion") (**Doc. 24**). The Court, having reviewed the parties' briefing and considered counsels' oral arguments as well as the applicable law, finds that the Motion is not well-taken and is therefore **DENIED.**

### FACTUAL BACKGROUND

This case arises out of an incident on April 5, 2019, involving Defendant and multiple members (collectively refenced as "deputies") of the Cibola County Sheriff's Office ("CCSO"). Defendant moves to suppress all evidence obtained from his property. He argues that law enforcement lacked probable cause to arrest him and to conduct a subsequent "security sweep" of his property, which led to CCSO obtaining a search warrant, the fruits of which led to two additional search warrants. Additionally, Defendant argues that any of his post-arrest statements should be excluded on *Miranda* grounds.

The Court held a hearing on this matter on July 1, 2020. The Government called several current and former members of the CCSO. The witnesses called by Defendant were additional law enforcement officers. At that hearing, the following facts were established:

On April 5, 2019, members of CCSO were dispatched to Defendant's residence in reference to a possible stolen vehicle. The call came from an anonymous, never identified caller, who stated there was a stolen green, lifted, long bed Chevy truck at Defendant's home. (Tr. of Anonymous Call, Def.'s Ex. B). Four deputies initially went to the scene: Alan Roane, Julian Armijo, A. Romero, and Gabrielle Romero. When the deputies arrived, they approached the property from the public street and entered the property through an open gate. Defendant's property was partially, but not fully, surrounded by a metal chain link fence. Although parts of the fence had plastic slats/lattice through it, evidence presented at the hearing clearly showed that a person standing on the road could see through parts of the fence. (*See* Photo of Property, Gov's Ex. 7). Deputies observed a number of "stripped" vehicles on the property. From the street, deputies could also see a vehicle matching the description of the one in question.

Upon entering the property through the open gate, the deputies observed the mobile home, multiple vehicles, and a large carport (also referred to as a garage) which was solid on three sides with a solid roof. The front of the carport was open and facing the gate. Deputies also observed an unidentified male subject, who walked between the carport and mobile home and then out of sight of the deputies. None of the deputies ever saw where this male subject went. Deputies observed two additional male subjects in the carport, one of whom was Defendant. Deputies testified that it appeared that the men were doing some type of body work on the vehicle. Deputies made contact with Defendant, informing him that they were there on the report of a possible stolen vehicle. Upon hearing this, Defendant became agitated and asked the deputies to leave the

property.  Deputy Roane told Defendant that is was possible that there was a misunderstanding, and asked Defendant for permission to run the license plate.  Defendant agreed.  Deputy Roane contacted Cibola County dispatch and learned that the license plate displayed on the green Chevy truck did not correspond to that vehicle.  Deputy Roane told Defendant what he had learned.  Defendant became more agitated.  Deputy Roane then asked for permission to run the vehicle identification number (VIN).  Again, Defendant consented.  The VIN came back to the vehicle which had been reported stolen.  When deputies relayed this to Defendant, he told them that the truck had been dropped off by someone named Michael.  Defendant told deputies he did not want a stolen truck on his property.

Deputy Armijo, in an effort to "deescalate" the situation, allowed Defendant to move the truck onto the street.  Defendant asked to speak to a CCSO supervisor and if he could go into the home.  Deputies summoned a supervisor, but would not allow Defendant to go into the mobile home because of the fact that they had at least one subject unaccounted for and they did not believe allowing Defendant into the home while waiting for a supervisor was safe.  Eventually Undersheriff Munk responded to the scene.  Shortly after Undersheriff Munk arrived, he observed movement from within the mobile home, but was not sure who it was.  Defendant told Undersheriff Munk that he had bought the Chevy truck for $200 from a man in Albuquerque, a story which Munk found implausible.  Deputies informed Defendant he was being detained and attempted to handcuff him.  Defendant became combative, eventually fighting with deputies, who in turn deployed a Taser.  Defendant was subdued, arrested, and transported from the scene.

Defendant's girlfriend, Angelica Munoz, also became involved in the altercation. Undersheriff Munk testified that during the fight Munoz grabbed Undersheriff Munk and pulled him off the Defendant.  Munoz was arrested for battery on a police officer.  Before being

transported from the scene, Munoz asked to use the bathroom. Lieutenant Monte and Deputy G. Romero escorted her inside and allowed her to use the master bathroom. In a video exhibit prepared by Defense Counsel's investigator, it was clear that the entrance to the master suite, which includes a bedroom and a bathroom, was located immediately to the right of the front door, which opens into a living room. (Def.'s Ex. F). The video showed that it was not possible to see the entirety of the mobile home from the front door or the door to the master bedroom. Lieutenant Monte testified that neither she nor Deputy G. Romero went into any other part of the mobile home while they waited for Munoz to use the bathroom.

Deputies then performed a "protective sweep" (sometimes called a "security sweep") of Defendant's mobile home. Deputies explained that there was still one unaccounted for male subject and they did not know whether there were any others on the property on in the mobile home. Deputy Armijo testified that, during the sweep, he observed numerous titles and other vehicle documentation, as well as a card audio amplifier, inside the home. Deputy Armijo testified that these items appeared consistent with stripping or altering of stolen vehicles. Deputy Armijo then completed the affidavit for search warrant.

Upon receiving the warrant and during the initial search, deputies searched the carport and other outdoor areas of the property and discovered another stolen vehicle, an empty ammunition magazine, and a rifle. The search was stopped so that another warrant for weapons could be obtained since at this point in time, deputies knew Defendant was a convicted felon and thus prohibited from possessing firearms. After obtaining the second warrant, deputies continued the search, eventually locating a clear, crystal-like substance which appeared to be methamphetamine. Again, the search was stopped so that a third search warrant could be obtained.

**DISCUSSION**

The Fourth Amendment protects individuals and their property from unreasonable searches and seizures by the government. *See United States v. Ibarra*, 955 F.2d 1405, 1409 (10th Cir. 1992). "The ordinary remedy in a criminal case for violation of the Fourth Amendment is suppression of any evidence obtained during the illegal police conduct." *United States v. Olivares-Rangel*, 458 F.3d 1104, 1108 (10th Cir. 2006). "The Supreme Court has . . . reiterated, however, that suppression of evidence should be a last resort, not a first impulse." *United States v. Sells*, 463 F.3d 1148, 1154 (10th Cir. 2006) (citing *Hudson v. Michigan*, 126 S. Ct. 2159 (2006)) (internal quotation and alteration marks omitted).

"On a motion to suppress, the district court must assess the credibility of witnesses and determine the weight to give to the evidence presented; the inferences the district court draws from that evidence and testimony are entirely within its discretion." *United States v. Goebel*, 959 F.3d 1259, 1265 (10th Cir. 2020). "The defendant has the burden of showing the Fourth Amendment was implicated, while the government has the burden of proving its warrantless actions were justified. *Id.* (internal citations omitted)

Defendant raises five principle arguments in support of his Motion. The Court addresses each in turn.

### I.   The Deputies' Entry onto Defendant's Property Did Not Violate the Fourth Amendment.

Defendant's first argument is that the deputies' entry onto his property was unlawful. "[T]he warrantless entry of the home is the chief evil against which the Fourth Amendment is directed." *United States v. Lowe*, 999 F.2d 448, 451 (10th Cir. 1993) (quoting *United States v. United States District Court*, 407 U.S. 297, 313, (1972) (internal quotation marks and alterations omitted)). It is well-settled law that "searches and seizures inside a home without a warrant are

5

presumptively unreasonable and therefore unconstitutional." *United States v. Dupree*, 540 F. App'x 884, 890 (10th Cir. 2014) (quoting *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) (internal quotation marks omitted)). In addition to the home itself, the Fourth Amendment protects the "curtilage" of the home. *United States v. Dunn*, 480 U.S. 294, 300 (1987). What constitutes "curtilage" is informed by a number of factors, the central question of which is "whether the area harbors the intimate activity associated with the sanctity of a man's home and the privacies of life." *Id.* (internal quotation marks and citation omitted).

The principle of protected curtilage, like almost all legal doctrine, is not without exceptions. In *United States v. Shuck*, the Tenth Circuit explained that "[t]he portion of the curtilage that is the normal route of access for anyone visiting the premises is only a semi-private area on which police may set foot if they restrict their movements to places visitors could be expected to go (e.g., walkways, driveways, porches)." 713 F.3d 563, 567 (10th Cir. 2013) (internal quotation marks and citation omitted). "[O]bservations made from such vantage points are not covered by the Fourth Amendment." *Id.* (alteration in original). The Court explained that "[o]fficers are allowed to knock on a residence's door or otherwise approach the residence seeking to speak to the inhabitants just as any private citizen may." *Id.* at 568 (quoting *Estate of Smith v. Marasco*, 318 F.3d 497, 519 (3d Cir. 2003)).

In this case, the question of whether the deputies' intruded on the curtilage of the home is essentially academic. Even assuming the carport was protected curtilage, the deputies' actions were within the scope of the exception outlined in *Schuck*, and thus not unconstitutional. *See Dunn* 480 U.S. at 303. (concluding that the part of the property at issue was *not* protected curtilage, but even assuming it was, it did not automatically follow that law enforcement's actions violated the Constitution). Defendant's argument from the evidentiary hearing—that none of the officers

parked within the enclosed area of the property, thus demonstrating that they knew it was a private area—is unpersuasive.  The Court has already assumed, in Defendant's favor, that the carport was protected curtilage.  But this argument does nothing to negate the control of the on-point law in *Shuck*.  The deputies here used the "normal route of access," *Shuck*, 713 F.3d at 567, to approach the carport through an open gate, which is "'no more than any private citizen might do." *Id.* at 568 (quoting *Florida v. Jardines*, 569 U.S. 1, 8 (2013)).  Accordingly, the Court concludes that under these circumstances, there was no "illegal entry into the curtilage of [Defendant's] home." (Doc. 24 at 9).

What is more, even assuming as true Defendant's contention that the Chevy truck was *not* visible from the street, there is no doubt that deputies could have seen it from the "curtilage."  That an "area is within the curtilage does not itself bar all police observation."  *Id.* at 569.  The Fourth Amendment does not require "law enforcement officers to shield their eyes" from those things they can readily observe from where they are lawfully permitted to be.  *Id.*  In this case, deputies were permitted to enter the property as they did.  Their observations are not rendered unlawful even *if* made from the curtilage rather than the street.

## II.     Defendant's arrest was supported by probable cause.

Defendant next argues that deputies lacked probable cause for his arrest.  It is blackletter law that the standard for an arrest is probable cause. *See Cortez v. McCauley*, 478 F.3d 1108, 1117 (10th Cir. 2007) ("The law was and is unambiguous: a government official must have probable cause to arrest an individual." (citing *Tennessee v. Garner*, 471 U.S. 1, 7, (1985)).  Here, Defendant argues that because the deputies' entry onto his property was illegal—and thus everything which flowed from it must be suppressed—the only basis for his arrest was an anonymous tip, which is insufficient to establish probable cause.  (Doc. 24 at 6).  However, at the evidentiary hearing,

7

Defense Counsel conceded that, assuming the Court found that Defendant consented to the deputies' running of the license plate and VIN, there was probable cause to support Defendant's arrest in that he was found to be in possession of a stolen car.  (Doc. 66 at 220:25–221:3).

Defendant does not genuinely dispute whether or not he consented to the running of the license plate and VIN.  Instead, his main argument on this issue is that he did not *voluntarily* consent, and did so only after deputies refused to leave, despite Defendant repeatedly and persistently asking them to go.  "Voluntariness is a factual issue, determined through the totality of the circumstances."  *United States v. Guerrero*, 472 F.3d 784, 789 (10th Cir. 2007).  Here, Defendant's argument mischaracterizes the evidence on the record.  For one, while Deputy Roane admitted that Defendant asked him to leave, he did not recall how many times this happened. Deputy Armijo testified he did not recall whether Defendant asked him to leave or not.  Additionally, Defendant argued that there was a discrepancy in the testimony regarding whether he gave consent.  But again, this mischaracterizes the evidence.  Deputy Roane testified that Defendant consented, while Deputy Armijo testified that he did not recall hearing Deputy Roane ask for consent.  While Deputy Armijo's testimony is not a confirmation of Deputy Roane's testimony, it is certainly not a contradiction, either.  In other words, there was no testimony that Defendant did *not* consent.  The only "evidence" of Defendant's will being overcome, rendering his consent involuntary, is the argument of his counsel at the hearing, which is not, in fact, evidence. Under the totality of the circumstances, the Court concludes that Defendant voluntarily consented to the search and allowed Deputy Roane to collect both the license plate number and VIN.

The Court has already concluded that deputies' entry onto the property was not unlawful. Accordingly, the Court has no trouble concluding that probable cause existed for Defendant's

arrest. The testimony in this case is that the deputies approached Defendant's carport through an open gate. They encountered Defendant and told him why they were on the property, which was to investigate a tip regarding a stolen vehicle matching the description of one deputies could see in the carport. When Defendant became angry, deputies told him that it could be a misunderstanding and asked Defendant for permission to run the license plate and VIN. Defendant consented. When the license plate came back as belonging to another car and the VIN as belonging to the vehicle which had been reported stolen, the deputies had sufficient, trustworthy information to believe a crime had been committed. *See Cortez*, 478 F.3d at 1116.

### III.     The Protective Sweep Was Lawful and Justified by Specific, Articulable Facts.

Defendant next argues that the warrantless search of his property, deemed a protective sweep by law enforcement, was unconstitutional. "A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." *Maryland v. Buie*, 494 U.S. 325 (1990). In *Buie*, the United States Supreme Court held that a warrantless protective sweep does not offend the Fourth Amendment if there are "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* at 334. Although *Buie* dealt with an arrest inside a residence, the Tenth Circuit has held that the doctrine may extend to a protective sweep inside a home following an arrest outside the home depending on the circumstances. *United States v. Cavely*, 318 F.3d 987, 995 (10th Cir. 2003).

Defendant argues that *United States v. Carter*, 360 F.3d 1235 (10th Cir. 2004), should control here. In *Carter*, the Tenth Circuit held the protective sweep exception did not apply where the defendant was arrested outside and there was no reason to believe anyone else remained inside.

9

Here though, deputies did not know where the unknown male subject who they first saw when entering the property had gone. And Undersheriff Munk had seen movement from inside the trailer. Additionally, when Lieutenant Monte and Deputy G. Romero escorted Defendant's girlfriend, Ms. Munoz, to the bathroom, they did not go into any other part of the mobile home, nor could they see any other part of the home aside from the living room and master bedroom. (*See* Def.'s Ex. F). Thus, despite Defendant's contention otherwise, when deputies conducted the sweep after Defendant and Munoz were in custody, they did not actually know whether anyone remained inside the mobile home. The facts here are also distinguishable from a second case cited by Defendant, *United States v. Hogan*. 38 F.3d 1148(10th Cir. 1994). In *Hogan*, the Tenth Circuit, in affirming the suppression of evidence, explained that "there was no indication that the officers were in danger from a hidden accomplice on that day." *Id.* at 1150. But here, where an unknown male subject remain unaccounted for, the deputies could have reasonably concluded there *was* a danger from a hidden accomplice, especially given the fight between deputies, Defendant, and Ms. Munoz.

**IV.     The Search Warrant Was Supported by Probable Cause.**

Defendant next challenges the search warrants obtained by deputies. First, he argues that the initial affidavit for search warrant (Gov's Ex. 1) is supported by fruits of the unlawful entry onto his property. (Doc. 24 at 15). It is axiomatic that "[a]n affidavit containing erroneous or unconstitutionally obtained information invalidates a warrant if that information was critical to establishing probable cause." *United States v. Snow*, 919 F.2d 1458, 1460 (10th Cir. 1990). But here, having concluded that the deputies' entry onto Defendant's property and the protective sweep were permissible, the Court can summarily dispose of this argument. As described by the Court, above, there was nothing unconstitutional about the way any of the information in the search

warrant was obtained. Accordingly, the Court rejects Defendant's argument that the evidence seized pursuant to the first search warrant must be suppressed as fruit of the poisonous tree.

Defendant also argues that the search warrants lacked probable cause and contained material omissions which render them unlawful. Review of the issuance of a warrant is deferential; "so long as the [court] had a substantial basis for concluding that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more." *Illinois v. Gates*, 462 U.S. 213, 236 (1983) (internal quotation marks and citation omitted). An affidavit for warrant is thus viewed as a whole, given the totality of the information contained therein. *United States v. Glover*, 104 F.3d 1570. 1578 (10th Cir. 1997) (*overruled in part on other grounds by*, *Corley v. United States*, 556 U.S. 303, 313 (2009)). Federal courts are admonished to "resolve doubtful or marginal cases by deferring to a . . . judge's determination of probable cause." *United States v. Biglow*, 562 F.3d 1272, 1282 (10th Cir. 2009).

Defendant asserts that deputies' omitted the fact of their "illegal" entry on to Defendant's property and that the Chevy truck was no longer on the property. (Doc. 40 at 10). But the entry and protective sweep were not illegal and, in any case, neither is omitted from the affidavit. (Gov's Ex. 1 at 2–3). The fact that the truck had been moved by Defendant off the property was also clearly set forth in the affidavit. (*Id.* at 3). There is nothing to support Defendant's argument that the warrant would not have issued but for certain information being omitted when that information was not omitted at all.

The facts supporting the initial warrant (Gov's Ex. 1) are as follows: Defendant was found in possession of a stolen vehicle, the license plate of which had been switched. Defendant became "irate" when deputies informed him the vehicle was stolen and wanted to physically distance himself front the vehicle. Deputies observed a number of stripped, taken apart vehicles, which in

their training and experience were indications of stolen cars. Deputies also observed a car audio amplifier and multiple vehicle titles, which, again, they believed was consistent with an operation dealing in stolen vehicles. Defendant had an angry demeanor with the deputies and engaged them in a physical altercation. Defendant told deputies that he had been given the vehicle and key by a man named Michael in Albuquerque for the purpose of doing body work, but Deputy Armijo contacted the owner of the vehicle, a woman, who reported the vehicle had been stolen from Milan, New Mexico. Based on all they had observed, deputies reasonably believed the property contained evidence related to stolen property.

Defendant also contends that there was an insufficient nexus between Defendant's property and the criminal activity alleged by law enforcement because the state court judge relied too heavily on Deputy Armijo's opinions. But "the nexus between the place to be searched and the evidence sought may be established through normal inferences about the location of evidence." *Biglow*, 562 F.3d at 1280. Here, law enforcement set forth a substantial basis linking the activity on the property, including at least one stolen vehicle and others stripped in a manner consistent with theft and the assorted vehicle titles observed inside the mobile home, to criminal activity related to stolen property. It is no stretch to conclude there was a fair probability of discovering additional evidence related to the stolen vehicle *inside* the home. Put another way, it was reasonable for the judge to assume evidence related to a stolen vehicle could be found inside. Indeed, this strikes the Court as precisely the kind of practical consideration which was explicitly endorsed by the Tenth Circuit in *Biglow*. Under the totality of the circumstances, the Court concludes that the affidavit set forth a substantial basis for probable cause to support the initial search. Additionally, because the two additional warrants flowed from what was discovered on

the initial and subsequent searches, respectively, and Defendant makes no independent challenge to those warrants, the Court finds no grounds to suppress the evidence obtained pursuant to them.

### V. Defendant Did Not Sufficiently Develop His *Miranda* Argument, and the Only Specifically Identified Statement Is Not Protected.

Defendant also seeks suppression of statements on the grounds that the deputies did not give him a *Miranda* warning. "It is well established that under *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), in order to protect the privilege against self-incrimination, law enforcement officers must administer prophylactic warnings regarding the privilege to any suspect subjected to 'custodial interrogation.'" *United States v. Erekson*, 70 F.3d 1153, 1156 (10th Cir. 1995). The need for a *Miranda* warning is triggered when the defendant is "questioned in custody" and the questioning "meet[s] the legal definition of 'interrogation.'" *United States v. Perdue*, 8 F.3d 1455, 1463 (10th Cir. 1993). A person is 'in custody' "whenever he 'has been deprived of his freedom of action in any significant way.'" *Id.* (quoting *Miranda*, 384 U.S. at 444). An interrogation "includes 'any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *Id.* at 1464 (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) (alteration in original)). Accordingly, "police officers are not required to administer *Miranda* warnings to everyone whom they question." *United States v. Eckhart*, 569 F.3d 1263, 1275 (10th Cir. 2009) (internal quotation marks and citation omitted).

As a threshold matter, Defendant does not identify any particular statement or statements he wishes to suppress. Nor does Defendant provide the Court with argument on what event triggered the necessity of a Miranda warning—in other words, when he was rendered "in custody" or how he was subjected to an "interrogation." The Government points this out its Response, and notes that it was not aware of any post-arrest statement which it would attempt to rely upon a trial. (Doc. 33 at 23). Defendant did not directly address this argument in his Reply or at the hearing.

13

The only statement Defendant specifically refers to is his "consent to investigate the VIN of the allegedly stolen vehicle." (Doc. 40 at 4). It is not for the Government—nor the Court itself—to have to speculate about what statements or statements Defendant wishes to suppress. Left only with the single statement referred to with any specificity, Defendant's consent, the Court concludes no *Miranda* warning was required at that time.

The evidence is clear that Defendant was detained, and ultimately arrested, after a fight with deputies and placed handcuffed in a law enforcement vehicle. At that point, no one could doubt that he was "in custody." Defendant argues that his arrest happened sooner, when he was "ordered" by deputies to wait for the requested supervisor inside a CCSO vehicle. (Doc. 24 at 10). Even assuming Defendant is correct, the Court concludes that before this point Defendant was neither in custody nor subject to an interrogation. Deputies were responding to a tip about a stolen vehicle, which was corroborated when they saw a truck matching the description of the stolen vehicle inside Defendant's carport while approaching that carport through the open gate. When deputies approached Defendant and explained why they were there, Deputy Roane asked for Defendant's consent to run the license plate and the VIN. Deputies did not restrict Defendant's freedom of action in any significant way. What is more, in asking for his consent, they were not asking Defendant anything they should have known would have drawn an incriminating response. *See Perdue*, 8 F.3d at 1463. In fact—Defendant's response, that yes, he consented to the search, was not in and of itself incriminating. The initial interaction here was akin to a traditional *Terry* stop, where police have reasonable suspicion to conduct an investigation. The Tenth Circuit has explained that *Miranda* is "simply not implicated in the context of a valid *Terry* stop." *Id.* at 1464. Under the circumstances here, the Court concludes that deputies were not required to give Defendant a *Miranda* warning. Moreover, the Court has already determined that Defendant's

consent was not given involuntarily. Therefore, Defendant's request to suppress statements is denied.

## CONCLUSION

The law enforcement officials in this case acted within the bounds of the Fourth Amendment. Therefore, for this and all the foregoing reasons, Defendant's Motion to Suppress Evidence and Statements (**Doc. 24**) is **DENIED**.

**IT IS SO ORDERED**.

_____
WILLIAM P. JOHNSON
CHIEF UNITED STATES DISTRICT JUDGE